TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

DANIEL E. LUNGREN
Attorney General

---

|  |  |  |
|---|---|---|
| OPINION | : | |
| | : | No. 93-308 |
| of | : | |
| | : | December 15, 1993 |
| DANIEL E. LUNGREN | : | |
| Attorney General | : | |
| | : | |
| ANTHONY S. Da VIGO | : | |
| Deputy Attorney General | : | |
| | : | |

---

THE HONORABLE BERNIE RICHTER, MEMBER OF THE CALIFORNIA ASSEMBLY, has requested an opinion on the following question:

May a county board of supervisors open its sessions with an invocation?

CONCLUSION

A county board of supervisors may open its sessions with an invocation.

ANALYSIS

We are asked to examine the permissibility of the practice of a deliberative body of a public entity (here a county board of supervisors) commencing its sessions with an invocation. An invocation, for purposes of this analysis, is "a prayer of entreaty that is usually a call for the divine presence and is offered at the beginning of a meeting. . . ." (Webster's Third New Internat. Dict. (1961) p. 1190.) May a public deliberative body regularly permit such an invocation? We conclude that it may.

In the absence of any contrary specifications, it will be assumed that the invocation in question is not (1) required by law as a condition to the official proceedings, (2) part of the deliberative agenda but rather incidental thereto, (3) offered by or supervised or approved as to content by a public officer, (4) officially limited to a particular religion, (5) disparaging of others, or (6) directed towards proselytizing.[1]

---

[1] No opinion is expressed concerning the constitutional validity of a practice which lacks any of the assumed characteristics of the invocation under consideration. The assumptions are based upon the typical practices of public bodies which permit the opening of their sessions with an invocation.

The First Amendment of the United States Constitution provides in relevant part:

"Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof; . . ."

This restriction against the exercise of federal power is applicable to state and local governments as well, by virtue of the due process clause of the Fourteenth Amendment. (See *Lee* v. *Weisman* (1992) 505 U.S. __ [120 L.Ed.2d 467, 480-481; 112 S.Ct. 2649].)

In *Marsh* v. *Chambers* (1983) 463 U.S. 782, the United States Supreme Court sustained the constitutional validity of opening the sessions of legislative and other deliberative public bodies with an invocation. The court stated in part:

"The opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country. From colonial times through the founding of the Republic and ever since, the practice of legislative prayer has coexisted with the principles of disestablishment and religious freedom." (*Id*., at 786.)

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"It can hardly be thought that in the same week, members of the First Congress voted to appoint and to pay a chaplain for each house and also voted to approve the draft of the First Amendment for submission to the states, they intended the Establishment Clause of the Amendment to forbid what they had just declared acceptable. In applying the First Amendment to the states through the Fourteenth Amendment . . . it would be incongruous to interpret that clause as imposing more stringent First Amendment limits on the states than the draftsman imposed on the Federal Government." (*Id*., at 790-791.)



"To invoke divine guidance on a public body entrusted with making the laws is not, in these circumstances, an `establishment of religion' or a step toward establishment; it is simply a tolerable acknowledgment of beliefs widely held among the people of this country." (*Id*., at 792.)

The issues to be resolved herein are (1) whether, in the decade following the decision in *Marsh*, the court has taken a different approach which might portend a modified result and (2) whether the California Constitution would compel a different result in this state.

1.    Subsequent Federal Considerations

In *Allegheny County* v. *Greater Pittsburg ACLU* (1989) 492 U.S. 573, the court held unconstitutional a display of a Christian nativity scene on public property. Without limiting its holding in *Marsh*, which the court explicitly noted was based upon the unique history and tradition of legislative body invocations, the court employed its traditional analysis of religious establishment clause cases as set forth in *Lemon* v. *Kurtzman* (1971) 403 U.S. 602. Under *Lemon*, to withstand an establishment clause challenge, the government practice must be shown to (1) reflect a clearly secular purpose, (2) have a primary effect that neither advances nor inhibits religion, and (3) avoid excessive government entanglement with religion. (*Allegheny County* v. *Greater Pittsburg ACLU, supra*, 492 U.S. at 592.)

In *Lee* v. *Weisman, supra,* 120 L.Ed.2d 467, the court invalidated a public school initiated and sponsored graduation invocation. The court, after declining to reconsider the *Lemon* criteria in general, discussed and distinguished, but in no manner disapproved, its opinion in *Marsh.*[2] The court stated:

"Inherent differences between the public school system and a session of a State legislature distinguish this case from Marsh v. Chambers . . . . The atmosphere at the opening of a session of a state legislature where adults are free to enter and leave with little comment and for any number of reasons cannot compare with the constraining potential of the one school event most important for the student to attend. The influence and force of a formal exercise in a school graduation are far greater than the prayer exercise we condoned in Marsh. . . ." (*Id.*, at 487.)

To this date, then, the United States Supreme Court has neither retreated from its three-part *Lemon* analysis of religious establishment clause cases in general nor deviated from the unique approach taken in the legislative body invocation cases which has been based upon considerations of history and tradition.

2.     California Constitutional Considerations

In *Sands* v. *Morongo Unified School District* (1991) 53 Cal.3d 863, the California Supreme Court examined the constitutional ramifications respecting invocations at high school graduation ceremonies.[3] Justices Kennard, Mosk, and Broussard concluded that a school graduation invocation violated the First and Fourteenth Amendments of the United States Constitution under the *Lemon* test. (*Id.*, at 883-884.) Chief Justice Lucas concurred "reluctantly" under the supremacy clause (*id.*, at 884), but "would, if free to do so, uphold the challenged practice of the school district" (*id.*, at 901). Justice Arabian concurred ". . . reluctantly, with the hope and expectation that the high court will soon endorse another view." (*Id.*, at 918.) In dissent, Justice Panelli would have upheld the invocation under both *Marsh* (*id.*, at 923, 925) and *Lemon* (*id.*, at 925, 939). Justice Baxter, dissenting, stated that he "would not hold that prayer is in all circumstances constitutionally impermissible in a public high school graduation ceremony" under *Lemon*. (*Id.*, at 944.) With respect to the California Constitution, Chief Justice Lucas summarized as follows:

"As a result of the various opinions filed in this case, three justices have concluded that the practice violates our state Constitution, two have concluded it does not, and two (myself included) have declined to reach any state constitutional issues. Therefore, our judgment does not rest on the state Constitution; any resolution of the state issues will necessarily await another day." (*Id.*, at 902.)

In view of the foregoing judicial treatment of school graduation invocations in *Sands*, it remains to be determined how the California Supreme Court would now address the issue of legislative body invocations under the provisions of the California Constitution.

---

[2]The four dissenting justices, citing Justice Holmes' aphorism that "a page of history is worth a volume of logic" (*New York Trust Co. v. Eisner* (1921) 256 U.S. 345, 349), would have applied the *Marsh* approach to school graduation as well as to legislative body invocations.

[3]The *Sands* decision predated the United States Supreme Court's five-to-four decision in *Lee* v. *Weisman*.

Article I, section 4 of the California Constitution provides in part:

"Free exercise and enjoyment of religion without discrimination or preference are guaranteed. . . . The Legislature shall make no law respecting an establishment of religion."

Article XVI, section 5 in turn provides:

"Neither the Legislature, nor any county, city and county, township, school district, or other municipal corporation, shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose, . . ."[4]

Extrapolating from the concurring and dissenting opinions in *Sands*, we believe that if the issue were presented to the court today, a majority would hold that legislative body invocations are not prohibited by the California Constitution. In his dissent in *Sands*, Justice Panelli referred extensively to the history and tradition of ceremonial prayer in California (53 Cal.3d at 931-933),[5] concluding that such an historical perspective provides no support for the "separationist interpretation" under the state provisions (*id.*, at 934-936). Both of the dissenting justices were of the view that neither of the provisions unique to the California Constitution, i.e., the "preference or discrimination" clause and the prohibition against grants in aid for religious purposes, precluded a properly conducted invocation. (*Id.*, at 933-939, 945-947.) With regard to the two state provisions, Justice Panelli explained in part:

"In summary, I cannot find in the `preference or discrimination' clause an intent to erect the absolute `wall of separation' that would justify a decision to ban religious invocations at high school graduation ceremonies. Instead, the clause appears to add only the requirement that the state not prefer, or discriminate against, a particular sect. [Citation.] This requirement can be met by having the invocation delivered, on a rotating basis, by speakers representing various points of view. But the practical impossibility of accommodating all points of view on each occasion does not amount to discrimination. As we held in *Fox* v. *City of Los Angeles* (1978) 22 Cal.3d 792, 797, `[i]n the California Constitution there is no requirement that each religion always be represented.'" (*Id.*, at 935.)

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ."

"Even under the [*California Educational Facilities Authority* v. *Priest* (1974) 12 Cal.3d 593] standard, however, I would hold that religious invocations at high

_____

[4]Article IX, section 8, prohibits the appropriation of public money for the support of any sectarian school, or the teaching of any sectarian doctrine in the public schools. This provision would not pertain to the legislative body invocation in question as it might to a school graduation invocation.

[5]Justice Panelli observed:

"Since 1849 the state Constitution has begun with a religious invocation: `We, the People of the State of California, *grateful to Almighty God for our freedom,* in order to secure and perpetuate its blessings, do establish this Constitution.' (Cal. Const. of 1849, preamble.) This language, as well as the history of how it came to be included, eloquently refute the argument that the framers of the state Constitution intended to prohibit ceremonial prayer." (*Id.*, at 931.)

school graduation ceremonies do not violate article XVI, section 5. In *Priest* we held that this provision did not prohibit the state from making low-interest, government construction bonds available to private, sectarian colleges. [Citation.] We relied in part on our earlier decision upholding tax exemptions for parochial schools. [Citations.] If the material financial assistance to religious schools approved in these cases is not a `direct, immediate, and substantial' benefit [citation], then neither is a costless, brief, traditional invocation at a high school graduation ceremony." (*Id.*, at 938.)

With respect to the two California provisions, Justice Baxter expressed in dissent:

"Article I, section 4 of the California Constitution affords essentially the same guaranty of religious freedom and state neutrality as does the First Amendment, adding an express guaranty against discrimination or preference. [Citation.] Except as noted above, where a preference may be implied by the delivery of invocations by members of the same sect over an extended period, and an endorsement may be implied if the speaker solicits audience participation in religious prayer, the past practices of the Morongo Unified School District in permitting religious invocations at high school graduation ceremonies are not shown by this record to have denied any rights guaranteed by article I, section 4." (*Id.*, at 945.)

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"Because there is no expenditure of funds beyond the de minimis amount of overhead expense that may be attributable to the seconds during which a speaker may recite a prayer, and that recitation need not be viewed in all cases as reflecting state endorsement or support of the religious views of the speaker, I conclude that the California Constitution does not ban the inclusion in a graduation ceremony of all invocations in which the speaker may offer a prayer or statement of religious nature.
"Like the free exercise and establishment clauses of the First Amendment, therefore, the California Constitution does not prohibit all reference to religion in academic events. Again, it is sponsorship or endorsement, express or implied, of religion or a particular religion that is the evil sought to be avoided. . . ." (*Id.*, at 947.)

As previously noted, neither of the justices who concurred "reluctantly" with the *Sands* majority's interpretation of the First and Fourteenth Amendments of the federal Constitution reached the California constitutional issues. (*Id.*, at 884, 918.) Nevertheless, neither justice left any doubt as to his views concerning the probative significance of history and tradition upon an appropriate interpretation of California's charter document. Thus, Chief Justice Lucas stated:

"History plays two important roles in constitutional analysis. Initially, it aids in the search for core values and principles underlying the text of the Constitution that may reveal with greater specificity than the text itself the evils sought to be prevented and the benefits sought to be obtained by constitutional provisions. . . .

"History also provides a means to assess whether particular government practices have enhanced or inhibited basic constitutional values and principles over time. Although long-standing tradition alone does not constitutionally validate a policy or practice, it may be a factor of great importance in a pragmatic evaluation of its character and effect. . . ." (*Id.*, at 886.)

".  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"The public acknowledgement of a Supreme Being is a consistent element of American culture, specifically endorsed by the framers and upheld in the traditions of both state and national governments since the founding of the republic. . . .

"Since the First Congress, national government encouragement of public prayers, and other generalized references to a Supreme Being, has continued. . . .

".  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"All three branches of our national government and state governments continue to make ceremonial references to a Supreme Being. . . ." (*Id.*, at 890-891.)

Justice Arabian similarly viewed the issues from an historical perspective:

"Historically, religion and prayer have always played a role in our most cherished public ceremonies. . . . Modern times have not diminished the impulse or voice, on our most solemn public occasions, to invoke the divinity for blessing and guidance.

".  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"If history then offers no binding precedent, it does provide perspective. Public prayer is an American tradition. It has occupied . . . a long and honorable place in our public lives. . . .

".  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .

"Our national experience teaches that the mutual independence of church and state is the most conducive system to religious freedom and social and political tranquility. Public prayer does not threaten that harmony or the liberty of conscience which underlies it. On the contrary, it is through such occasions that we reinforce and celebrate the rich diversity that has made us a great and noble people." (*Id.*, at 917-918.)

Hence, we believe that a majority of the California Supreme Court today would uphold legislative body invocations, regardless of any holding on school graduation invocations, under both state and federal Constitutions.

In light of United States Supreme Court and California Supreme Court decisions relevant to the question presented, we conclude that a county board of supervisors may open its sessions with an invocation.

\* \* \* \* \*

6.                                                                93-308